TALIAFERRO, Judge.
Isaac F. Sibley, for himself and on behalf of his six minor children, joined by his wife, Mildred Hudspeth Sibley, instituted this suit against the defendants, Petty Realty Company, Inc., and its president and general manager, M. A. Mangham, to recover substantial damages allegedly sustained by them, respectively as a result of gas being cut off by the defendants from the building occupied by plaintiffs as a home.
The building in question contains three rooms. It belongs to the defendant corporation whose stock is entirely, or very nearly so, owned by Mr. Mangham. Acting for the company, in the year 1941, he leased the building to Sibley for $10 per month. It is located in the Henderson Iron Works Subdivision in what is known as the Agurs Section of the City of Shreve *702 port. It faces north on Finn Street (formerly Fifth Street) and is parallel and very close to a protection levee.
In addition to the lot upon which said building is situated, the company, at the time this suit arose, owned dozens of other lots in the same subdivision, some of which are southerly and some are easterly from the lot on which the building involved in this controversy, is located. Thirteen of them had very modest buildings thereon which were leased to others for small rentals.
At the time the building was leased to Sibley, all or nearly all of the tenants used wood for heating and cooking. This, in part, was gathered from accumulations along Red River, while some was purchased by and hauled to the respective tenants.
In the year 1943 a well producing gas was brought in some eight hundred feet north of Mangham’s residence. The Sib-ley house is midway between the well and this residence. Mr. Mangham was authorized by the owner of this well to connect a line thereto and use gas therefrom free. He at once accepted the offer and laid a line of one-inch surface piping, to his residence. The line passed west of the Sibley house only a few feet. At first, the residence of Mangham and that of one of his tenants, (J. H. Gongre) were the only ones into which gas was introduced. Soon thereafter Sibley consulted Mangham about connecting his house with the line and he was authorized to do so. There is sharp controversy as to who did the work necessary to put the gas into Sibley’s house. He says that Mangham did so and charged him $1.50 per month for gas thereafter, while Man-gham' denies both of these allegations of fact. He says that he told Sibley that as the gas cost him nothing he would be as generous as was the owner of the well.
On April 4, 1946, the Petty Realty Company, Inc., sold to E. A. Hamner and others the lot on which the Sibley home is located, and fifteen lots additional, constituting two tiers of eight lots each, separated by Finn Street. The lots were purchased as a location for a manufacturing establishment. Thereafter, the City Council officially abandoned that part of Finn Street between the two tiers. Automatically this area reverted to the owners of the adjacent lots.
In the deed to Hamner et als. it is stipulated that the improvements on the lots “are not sold by this deed and are to be removed by the vendors at their own expense”. Sibley was asked to vacate the premises, but refused. Thereafter Man-gham judicially sought to eject him for nonpayment of rent, but failed in the effort. 'Other efforts, extra judicially, came to naught.
In October, 1946, Mr. Hamner called Mr. Mangham’s attention to- the condition of the small surface gas pipe at and about the Sibley house. From heavy vehicular traffic it was bent and otherwise so badly disfigured that it was feared it would break and allow the gas to escape with possible disastrous results. To avert this possibility, Mr. Mangham promptly began to install a two-inch line in lieu of the old one. In order to be safe from damages from vehicular traffic and to avoid passing over lots sold Hamner et als., this line was laid along the levee east of the house.
After the new line had been laid some seven days it was on or about October 20, 1946, connected with the well, the old line was disconnected and gas flowed only through the new line. This left the Sib-leys without gas, — hence this law suit.
Plaintiffs allege that the line was disconnected about the hour of 3:00 o’clock p. m1., without notice to them of the intention so to do; that the weather was cold and they were deprived of fuel for heat and cooking for five days because during that period they were unable to procure wood to burn in their wood stove; that other houses of the defendant company were connected with the new line and thereafter supplied with gas; that demand was made upon Mangham to- connect their home with the new line but he refused to do so; that since the closing of Finn Street they cannot get wood over that street which comes to a dead end at the levee beside the house; that the new line at the locus of the house was so laid that wood could not *703 be hauled over it; that defendants have built a fence back of the Sibley house which prevents access thereto from that direction, and that all of these conditions made it quite difficult for plaintiffs to get the wood they have used since the loss of gas.
Plaintiffs additionally allege that due to defendant’s action in not connecting their house to the new gas line, three of the children contracted bad colds and were confined to bed for two weeks; that due to her having to be up at nights attending the needs of the sick children, without heat in the house, Mrs. Sibley contracted influenza that lasted three or four months; that defendants’ said action has caused all of the petitioners extreme embarrassment, etc.; that the twelve year old daughter had to miss school and she was especially embarrassed and humiliated when making excuses for her non-attendance; that Mr. Sibley was humiliated and embarrassed in not being able to report for daily work because he had to remain at home and get wood necessary for heating and cooking.
Prior to answering, the Petty Realty Company, Inc., formally called its insurer, the -Continental Casualty Company, in warranty, under allegations appropriate to its position that there was coverage under the terms of a policy contract issued to it.
Answering the call, the insurer denies that the policy contract was intended to, nor did it, embrace liability flowing from the facts alleged upon, -in that the policy provided protection against loss “imposed upon defendant by law for damages caused by accident”, and that the facts of this case show that the damages sought to be recovered herein did not arise from an accident.
Answering, the defendants articulately deny all of the allegations of the petition. They reaffirm the allegations of the call in warranty and pray that should judgment be rendered against them, or either of them, that like judgment be rendered against said warrantor, plus the additional sum of $750 as counsel fees.
The case, on plaintiffs’ motion, was tried with a jury. Verdicts were returned against Petty Realty Company, Inc., and Mangham, as follows, viz.:
In favor of Mrs. Sibley, $500' and in favor of each of the five youngest children, $150. The demands of Mr. Sibley and the twenty-year old son were rejected. The jury found for the insurer on its defense of lack of coverage, and the demand against it was rejected.
Application of defendants for new trial was denied. Judgment in keeping with the jury’s verdicts was signed. Defendants appealed to the Supreme Court. That Court decided that it had no jurisdiction of the cause of action alleged upon, and transferred the appeal to this Court. See 215 La. 597, 41 So.2d 230.
One of the most embattled issues in the case revolves around the contention of the plaintiffs that they monthly paid to the company through its said president, the sum of $1.50 for the gas they consumed. Another issue, but of less concern, is who extended the first gas line into the Sibley house. Overshadowing both of these issues, is the legal proposition advanced that as defendants were not legally required to supply gas to the Sibley house, whether for a charge or not, there rested no obligation upon them or either of them to continue such supply after once begun; and, as a corollary, when once disconnected from the gas line, there did not arise any obligation on defendants’ part to connect it to the new line.
A very significant fact in the case is that neither defendant was authorized by permit from any state agency or department, nor by the 'City of Shreveport, to lay the gas lines, supply gas or make a charge therefor, if supplied.
Neither defendant had the legal right to -sell gas to the public in the manner charged, and, perforce, neither was legally obligated to do so. They put gas only in their own buildings and were at liberty at any time to disconnect same.
Among the powers delegated by the Legislature to the City of Shreveport is that to regulate and control the use, quality and sale of gas within its territorial limits. Dart’s General Statutes, Par. 19, § 6260, *704 Act No. 158 of 1898, § 11, subd. 19, as amended by Act No. 220 of 1912. In the exercise of this power the City is authorized to appoint an inspector of gas and meters.
The Public Service 'Commission is given the power to fix and regulate the rates charged or to be charged by and service furnished or to be furnished - by public utilities. Dart’s General Statutes, § 7917, Act No. 24 of 1904, § 4.
Plaintiffs charge and argue that Mr. Mangham’s course, after selling the property, was that of determined effort to force them to surrender possession of the house; and that he did the various annoying and vexatious acts charged to him, in the hope that possession would be voluntarily given. The record, as we view it, does not sustain this contention. We doubt that this situation would -have arisen had the lot not been sold. After this Was done, it was defendants’ duty to remove the building within a reasonable time as the purchaser wished full possession of all of the lots. The building could not well 'be moved so long as occupied; and surely not while connected with the gas line.
The charge that Finn Street was blocked and a fence was erected at the rear end of the house purposely to prevent wood being brought to the house, is not sustained by proof.
After being closed by action of the City Fathers, Finn Street was freely used by Hamner and his associates while erecting new buildings. If the area formerly embraced within the street’s limits was blocked, as charged, it was by the purchasers of the adjoining lots and they were within their rights in so doing.
In regard to the erection of a fence south of the Sibley house, it is shown that this was done by another tenant of defendants. It is shown that they did not direct nor suggest that the fence be built and located as was done; in fact, it does not clearly appear that the fence (two barbed wires attached to posts) served to interfere with wood hauling as plaintiffs say.
The testimony pertinent thereto convinces us that Sibley, and not Mangham, made or had made, the necessary connections to put gas into the house. The workman who laid the line originally and also Mr. Mangham so testified. In view of all the circumstances, especially if no charge was made for the gas, this would have been the logical course to pursue.
Whether a charge for the gas was made is left in considerable doubt. Sibley, his wife and twenty-year old son all testify that this charge was made. No receipts were given. Sibley’s reputation for truth and veracity was severely attacked. Several of his neighbors testified that his general reputation was bad and that they would not believe him on oath. However, as we understand the pertinent law, it is immaterial, as respects liability, whether or not defendants charged for the gas.
In the instant case it is certain the lessee accepted the leased premises with the knowledge that he would have to use wood for heating and cooking. When the gas line was disconnected he was left in no worse condition, with respect thereto, than when he first occupied the premises.
A different case might be tendered if, after supplying gas to Sibley, the lessor, without advance notice -of his intention so to do, disconnected it with injurious results to the lessee or members of his family. But that is not the case before us. It is shown, as said before, that the two-inch line was laid several days prior to being connected. Sibley must be held to have had knowledge of this fact and why the new line was laid, as it passed only a few feet east of 'his house. Mangham tesi-fied that he told Sibley that there would not be any arrangement for a connection between the house and the new line. From these facts, Sibley was put on his guard and had ample time to lay in a supply of wood to meet the change in conditions then impending.
It was but natural that, as Mangham was eager to remove the house to fulfill his obligation to Hamner, et al., 'he was unwilling to again have the house connected with the new line. Regardless of this, he did suggest to Sibley that he run a line of his own from the well to the house. *705 He did so, but for the lack of proper equipment, the venture was not a success.
To hold defendants liable in damages, if such there were sustained, it would first be necessary to hold that they or one of them breached a duty owed to the defendants. Has this been done? We answer the question in the negative. Defendants had the unquestioned right to disconnect the gas line from the Sibley house when they chose so to do, because they were not obligated, as a matter of law, to allow them to introduce and use the gas in the building. It was in the building merely by sufferance. The motives or reasons back of the disconnection are of no special significance since the right to disconnect and not reconnect were absolute. There is respectable authority to support this holding. See: Sullivan v. Natural Gas Company, Inc., La.App., 154 So. 387; 28 Corpus Juris 568-569, § 32; 38 C.J.S., Gas, § 26; McCune v. Norwich City Gas Company, 30 Conn. 521, 79 Am.Dec. 278; Elwell v. Atlanta Gas-Light Company, 51 Ga.App. 919, 181 S.E. 599; Oklahoma Natural Gas Co. v. Young, 10 Cir., 116 F.2d 720, 132 A.L.R. 908.
It follows from the above stated conclusions that the question raised by and between the defendants and their war-rantor (insurer) is now moot.
For the reasons above and herein assigned, the verdicts of the jury and judgment based thereon, insofar as they reject the demand contained in the call in warranty, are affirmed.
And, for said reasons, the judgment from which appealed, insofar as it condemns the defendants in favor of the plaintiffs, named therein, is hereby annulled, reversed and set aside with costs.